All right, ready to roll. Let's call 23-6209 Doe v. Integris Health. Integris, how do you say that? May it please the court, good morning. My name is Kyle Cutts. I represent Integris Health. This lawsuit challenges Integris' use of certain technologies on its website. Integris operates its website much like it operates its hospitals, for the benefit of its patients and the communities it serves. But Integris' website serves another important function, a governmental function. Integris operates its website in furtherance of the governmental objective of an interoperable network of healthcare technology. The district court reviewing the record determined that by engaging in the challenge conduct, Integris was merely engaging in an incentive program and not complying with regulations. We contend, Your Honors, that the involvement of Integris here goes well beyond engagement in an incentive program and is furthering the government's objective of creating this network of information technology. It's true the regulations are heavily involved here, but this case is a far cry from Watson. There, Philip Morris was following detailed regulations in order to test low-tar cigarettes, a decidedly non-governmental contact. Here, by contrast, the regulations define the federal objectives and oversight that guide Integris in the creation of the envisioned infrastructure. So what is the basic governmental task that's at issue here for purposes of the removal statute? The basic governmental task, Your Honors, is ensuring that Integris' patients have the ability to engage meaningfully with their electronic health records. Does the government have the ability or the power to create patient portals for private health providers? The government has received through first the 2004 executive order and then the HITECH Act. I mean to create them itself. Can the government go out and create health portals? I don't know if the government itself can create the health portals. What it can do. And if they can't, they can't delegate that responsibility to you or you can't be performing a government function. I believe what the government can do is engage in a quasi-contractual relationship with Integris to provide something that the government has decided it needs. In 2004, President Bush outlined goals of the Meaningful Use Program, saying that what he wanted to see was an interoperable network of healthcare technology. That was slow to start off and it required the HITECH Act in 2011 to incentivize private healthcare providers to assist the government in the provision of that interoperable network. In any of those regulations in the patient engagement playbook, is there any discussion of the use of trackers? To my knowledge, the answer is no. That's what we have found as well. So are you asking us to infer that? What we're asking the court to conclude is to find that the government did indeed provide the instruction to Integris to help create this network. We're also finding that implicit in that instruction is the ability of Integris to determine the means by which it complies with its government mandate. We've submitted with our papers the declaration of William Hudson, who explains that the technologies at issue here were deployed in furtherance of the objectives of the Meaningful Use Program and help Integris satisfy its government mandated obligations. So participation is entirely voluntary, right? Participation in the Meaningful Use Program is entirely voluntarily. Once a hospital system has elected to participate in the Meaningful Use Program, then there are required steps that the government, excuse me, the hospital must satisfy in order to, at first, to gain additional Medicare and Medicaid benefits and over time to avoid penalties or reductions in those benefits. So it used to be an incentive and now it's a penalty, is that correct? That's correct, Your Honor. How should we be thinking about that change? I think in either an incentive or as a reduction. It demonstrates control of the government over the private entity that exhibits the close relationship that Watson talks about when it discusses control and whether a private entity is acting under the federal government for purposes of the federal officer removal statute. So it takes this out of the traditional regulator-regulated context and makes it more intrusive. Watson explains that regulations can show supervision. That was the case in Watson itself where the FTC was supervising Philip Morris in the production of low-tar cigarettes. Regulations in and of themselves are insufficient to establish the acting under relationship because they don't demonstrate assistance. And that's the complementary part of the acting under analysis. Are you supervised by the government and are you assisting the federal government in providing something the government has needed? We claim that we're doing both here. We're supervised through the regulations and we're assisting the government through the creation and maintenance of that interoperable network. And what the government has determined here is that it wants patients, Entangled Patients, other hospitals' patients, to engage in certain specific conduct that demonstrates engagement with their electronic health records. Viewing, using, downloading, transmitting. This is the behavior that the government has determined shows that patients have been empowered with the ability to access their health records and make determinations about those health records. But again, there's nothing anywhere in the regs, there's nothing anywhere in the handbook, the engagement playbook, that says anything about using trackers. That's correct, Your Honor. And we believe that goes to the second. Well, and that's what you're being sued for. That's correct. The question of whether the use of these technologies falls within the ambit of the federal officer removal statute I think is best addressed in the second prong of the statute, which is the causal connection prong. Which asks, is the challenge conduct, were we engaging in the challenge conduct, which is here the use of the technologies, because or while we're engaged in furthering the government's objective? Well, you first have to show that you're acting as a government agent in terms of using these trackers. I think, with respect to... I mean, you're not being, this case has nothing to do with the fact that you did indeed set up patient portals. This lawsuit challenges the way, it's our view, it's our theory of the case, which courts credit under the causal connection prong, that we engaged in the challenge conduct here, the use of these technologies on the website, in part in furtherance of our goal of meeting the meaningful use requirements, which is done under federal direction and control. What is your best site for federal direction to mine information from the patients? I would direct the court to Isaacson v. Dow, which was cited with favor in the Suncor case, which explains that when analyzing whether there is a causal connection between the government direction and the challenge conduct here, that you credit the defendant's theory of the case, and you ask whether the challenge conduct occurred because or while the private entity was engaged in the activity furthering the governmental interest. Part of this analysis arises from the 2000 amendment to the federal officer removal statute. There was some concern that the federal officer removal statute had been read too narrowly, and so Congress had amended it in 2011 to add or relating to the challenge conduct, which was intended to relax or expand the scope of the statute and keep it in line with the Supreme Court's instruction that the statute should be liberally construed. How should we be thinking about the circuit cases that don't help you? To my knowledge, there are four circuit cases that have come out the other way in here, the third, the fifth, the eighth, and the ninth. And I think that the fundamental, and although there's unique analysis in each one of them, I think a common thread that runs through them is an over-reliance on the concept of delegation. Courts have looked at this issue and go, we're not seeing any delegation. Delegation, of course, was a key word in the Watson decision, but I think these courts, the other appellate courts respectfully are putting too much emphasis on this delegation idea. Delegation, after all, was a concept introduced by Philip Morris in the briefing, saying the FTC delegated us the authority to make sure these low-tar cigarettes were safe. The Supreme Court held, we see no evidence of such delegation. And critically, and I think this is the language that I would guide the court to when thinking about our case, the Supreme Court said critically, nor do we see any contractual relationship, any payment, or any principal-agent relationship that would suggest the close relationship necessary to create the type of relationship that gives rise to federal officer removal. So delegation is absolutely one way in which, after Watson, one way in which a private entity may show government control and show that it's acting under the government, but it's not the exclusive way. And so I think there's an over-reliance on that. Equally, when thinking about these other cases, I do think there's an over-emphasis on whether the government would have created patient portholes for itself. It's quite possible that the government may have, given the direction that the national coordinator was vested with, and that Congress echoed, necessary of creating these interoperable networks. But instead of doing that, the government enlisted private entities. So I don't think the question is, is Integris, you know, does the patient porthole belong to the government, or does Integris' website, would the government have created its own patient porthole? In fact, the government has created things like the patient porthole, because the government, of course, is a provider of healthcare, one of the, one of, if not the largest provider of healthcare. In 2004, it was contemplated that electronic health systems, early electronic health systems, that were operated by the Department of Defense and the VA, could be shared with private entities to further the goal. It was contemplated. You may have already answered this question in responding to Judge McHugh, but if you had not put the tracking code in your website, would you have been out of compliance with the government's program requirements? No, I don't believe so. And they never ordered or instructed the companies to add this type of tracking code, right? That's correct, Your Honor. Rather, the technologies on the website are one of the means by which Integris ensures that it's in compliance with the Meaningful Use Program. Well, if you have that kind of discretion on what to include in the website without government instruction, doesn't that tend to make this look more like it would be outside the scope of the nondiscretionary program? I would liken it, Your Honor, to the rural electrification cases, which were cited in our brief. This is Butler, Cessna, Carver, in which private, non-for-profit entities were enlisted by the federal government to bring electricity to underserved communities. They had that instruction, but they also had the freedom to determine the means by which they did so. And here, it's the means by which we choose to comply with the Meaningful Use Program, in part, are being challenged here. But again, you weren't ordered to open these portals. It was discretionary. You didn't have to participate at all. That's correct. There was no requirement to participate in the Meaningful Use Program. What is the scope of the Medicaid or Medicare reimbursement for these programs? Is it per patient? How does the funding economics work? I believe it's per patient, and I believe that the Meaningful Use criteria seek to establish a percentage of patients engaging in the sought-after behavior. I'm happy to answer additional questions. If there are none, I'll reserve the remainder of my time. Thank you very much. Good morning, Your Honors. May it please the Court, Michael I. Davia for Appellee. I want to start off with the point that Judge McHugh and Judge Tinkovich, that you all had raised. What brings the parties to court and federal court here is appellant's removal under the Federal Officer Statute premise entirely on this Meaningful Use Program. And in this case, the allegations of this case, it's not the button that allows patients to access their medical records that brings us to court. Nobody has a problem with that. And it's also not the patient's ability to access their patient records. Nobody has a problem with that either. Those are the issues that are at the heart of the Meaningful Use Program. And what brings the parties to court is what defendants did with the information that they collected, surreptitiously, when patients went to the portal or when they went on their website and typed in something about their health conditions or made an appointment with a doctor. And it's that privacy violation, that commercial activity that defendant chose to engage in that is at issue in this case. And as we heard from my friend on the other side, none of that has anything to do with the Meaningful Use Program. My friend on the other side explained that he could have, his client could have complied with the Meaningful Use Program without having to install these tracking technologies that transmit private information to third parties. And so from the get-go, we have this claim that the Meaningful Use Program or that these tracking technologies are somehow furthering the Meaningful Use Program without any explanation. So from the start, we're 100 miles away from a federal officer sort of relationship. And even just looking at the Meaningful Use Program itself, Watson has been emphatic, was emphatic, and I think Judge McHugh and Suncor, you also explained this, that regulation by itself is simply not enough to confer federal officer status for acting under purposes. But we have more than that here, right, because we have a penalty for noncompliance. Well, Your Honor, with respect, a penalty is really a normal attribute of any regulation. If you don't follow the regulation, you could be subject to a penalty. I don't see how that takes us out of the arena of regulated conduct and brings us into this close supervision, tightly monitored relationship. So you would say that it wouldn't matter if it were construed as an incentive either? That's exactly correct. I think that's what the district court said as well, when the district court basically said that this actually is even less than a regulatory program, because it's entirely voluntary, and they're not really, all they're getting is, you know, either a penalty or, you know, I guess they used to get incentives, that that was phased out. And the third, the fifth, the eighth, the ninth circuits all sort of agreed that this was just a straightforward application of Watson and that the task at issue here simply is not a governmental function. And, you know, I think what I heard when I was listening to the argument is that, you know, the question is not just whether a private actor is helping the government, it's helping with what? And here there's simply no evidence that the, or nothing introduced in the record or in the notice of removal that would suggest that the federal government would come in and start building patient portals for the hospital, the private actor's patients. And we know that because they haven't, right? This was a program that was designed to further some sort of attack on the private sector. And it was a task, just like a regulation, to encourage a certain behavior. And so the government is not in the business of providing these patient portals. And they're not, and INTEGRIS is not providing the government with the patient portals, right? So, you know, in- Let me interrupt. I've been waiting for you to take a breath. Sorry, sorry. I got excited. Does it matter whether we're dealing with the public portal or the private patient portal? Your Honor, I don't think it does, and for two reasons. One, because at the end of the day, we're still interpreting the Meaningful Use Program, which is a regulatory framework. We're parsing regulations, and so really the Meaningful Use Program is a non-starter to begin with. But to the extent that we throw in the private side, I think that brings us 100 miles even further, because the Meaningful Use Program, to the extent it has any applicability here, only pertains to the private side of the portal. So I don't think it moves the needle in any way. And if anything, I think it cuts the opposite way if we, you know, try to parse that. And I would also point out that the Eighth Circuit actually addressed this issue in a separate opinion following the BJC health system, where it also agreed that it made no difference whether, you know, the allegations were premised on the private or the public portal. What do you say to your adversary's argument that the circuit decisions that go your way, you know, over-emphasized delegation? Well, Your Honor, I don't understand the other side to be saying that they were delegated any sort of authority. And I think that's what the circuits have said, is that there's, you know, in Watson in particular, I think the Supreme Court, Justice Breyer, wrote that delegation is usually explicit. The government just doesn't willy-nilly sort of have some sort of an implied delegation when it, you know, when it's delegating its authority. And so I don't see any sort of over-emphasis. I think what the courts were saying is, here, there's no basic government task, and so this isn't something that the government is involved in. They're just trying to regulate or encourage a certain behavior, and that's simply not enough under Watson and other circuit precedent to confer federal officer status. And I think that brings me to my next point, which is, you know, what is the limiting principle here? I listened to the argument, I read the briefs, and I just don't see one. I don't see how we can allow federal officer status in this case, but not in even the facts in Watson, where, you know, the cigarette manufacturer was under the strict scrutiny of the federal government to have all these testing mandates. And, you know, even I think the federal government even specified certain label, you know, things that have to be on the label, right? Here, I think we heard some argument where the federal government kind of says, here's the objective, figure out how to accomplish it, right? So there's autonomy here in terms of how they follow this program. And so I think that, you know, I don't see how you can have federal officer status here, but not in that case or even in other cases where there's some sort of delegation or there's some sort of activity that the government is interested in regulating, right? Farmers can take... One of the arguments that was made this morning was that the rural electric cases are somehow helpful because you have a task that the government wants performed, but you're given your own ingenuity to figure out how best to perform it. Right. And I think the key distinction between the rural electric cases and this case is that the federal government created those entities. They were deemed instrumentalities of the state. I don't think Integris is trying to assert that the federal government came and created it. It's a purely private entity. And so I think you still do have a much closer relationship in the rural electric cases where they were deemed an instrumentality of the case and were created by the federal government to further some sort of purpose. And so, you know, at the end of the day, you know, I think the touchstone of this is the federal government asking them to produce something, right? I think I heard my friend on the other side cite Isaacson versus Dow Chemical. You know, that was one of the Agent Orange cases where the federal government came in and asked these companies to basically produce something that was being, a chemical that was being used in the Vietnam War. And I think there was actually criminal penalties if they didn't comply with that and didn't agree to do that. And so I think that that case is so far off base from what we have here, where at the end of the day, they don't even have to comply with the Meaningful Use Program. They can choose not to be in it. And so for these reasons, Your Honor, unless the panel has further questions, I would respectfully request that the Court follow the fourth, or the fifth, the sixth, the fifth, the eighth, the ninth, and the Third Circuit and affirm. Okay. Thank you, Counsel. Mr. Couch, you had some rebuttal. Thank you, Your Honors. If Your Honors are looking for the connection between the use of the challenge technologies and the claims here, and Antegris' operation under the Meaningful Use Program, I direct the Court to the declaration of William Hudson at A221. If Your Honors were looking for corroboration of what Mr. Hudson says... I'm sorry. Can you give me that slide? I'm terribly sorry. A221, the declaration of William Hudson, specifically paragraph 10, in which he explains how the technologies assist Antegris in understanding how users interface with the public website and the obstacles they may face in navigating to the patient portal. If you're looking for confirmation of that, I would point you to Plaintiff's Complaint, in which they corroborate what Mr. Hudson says. Granted, they couch it as advertising and marketing, but they don't dispute. And what they say is in line with the basic point that these technologies help Antegris understand what's going on in its website, which Antegris claims is in furtherance of the Meaningful Use Program. Thank you for the time. We'd ask the Court to reverse. Thank you, counsel. We appreciate the arguments. Your excuse in the case shall be submitted. We're going to take about a ten-minute break.